BYRNES, Judge.
In this consolidated action for damages resulting from the electrocution of the plaintiffs, Ray Smith and Anthony Papania, an appeal is lodged which seeks to set aside two summary judgments which dismissed the general contractor, three sub-contractors and the alleged supplier of electricity to the work site where the plaintiffs were injured. We affirm the judgments of the district court.
The facts as revealed by the record are as follows:
Shell Oil Company (“Shell”) owns the land and facilities located on the grounds of its Jefferson Highway plant where the plaintiffs were injured. Over one year pri- or to this accident Shell had contracted for the construction of a new office/laboratory. In furtherance of the project, a design/build contract was entered with the prime contractor, Carl E. Woodward Inc. (“Woodward”) for the design and construction of the electrical service to the new facility. This contract resulted because Louisiana Power and Light (“LP & L”) refused to provide Shell with two service entrances to its facility. Woodward entered into a subcontract with Northside Electric, Inc. (“Northside”) for the electrical work dictated by the contract between the owner (Shell) and the prime contractor (Woodward). Thereafter, Northside entered into two subcontracts. The design of the electrical lines was subcontracted to Lucien T. Vivien, Jr. & Assoc., Inc-. (“Vi-vien”) and the erection of the electrical lines was subcontracted to Highlines Construction Co. (“Highlines”).
It was decided that the service lines to the new facility were to be constructed on 70 foot poles and were to run from the rear of the property along the property line where the LP & L service lines entered the Shell plant. The lines were to run to a point adjacent to Jefferson Highway and near the new building where the lines went underground and entered the new building. The power lines were thereafter constructed and tied into the newly constructed office/laboratory facility. The building and new electrical service were placed in operation by the end of 1985.
In May 1986 Shell decided to have the grease tank cleaned which is involved in this litigation. The tank had been constructed in 1954 and was never before cleaned. An employee from Shell arranged for the cleaning but failed to notify Shell’s engineering department of this activity. On the date in question the power lines servicing the office/laboratory facility were not de-energized. On May 14, 1986 *714 Ray Smith and Anthony Papania who were employed by Be-Neat Tank Cleaning Company, were sent to the Shell plant to clean the tall grease tank which was located at the plant on Jefferson Highway. The pair of men were using tall aluminum poles to perform their cleaning duties. While so engaged the poles came in close proximity with the nearby electrical wires causing an electrical arc to the aluminum poles. A surge of electricity went through the plaintiffs’ bodies resulting in electrical burns.
The plaintiffs filed an action in damages against Shell as the alleged owner.of the electric lines and against LP & L as the alleged builder of the lines.
The action against Shell alleged that this defendant was liable for the plaintiffs injuries under theories of strict liability and negligence. Smith and Papania alleged in particular that Shell failed to repair and maintain the electrical lines. The plaintiffs sought recovery against LP & L on the basis that this defendant constructed the electric lines; placed the allegedly ultra-hazardous lines in the near proximity of the tank; marketed and manufactured a defective device; and failed to warn of the defects.
Thereafter, Smith and Papania amended their suits to name as defendants, the prime contractor and the various subcontractors who participated in the design/build contract for the office/laboratory facility located at the Shell plant.
The plaintiffs contend that the various contractors were negligent in the design and erection of the electric power lines. In particular, the plaintiffs argue that since the lines were unreasonably dangerous that it was negligent not to design and/or build the lines so that they were placed underground and/or entirely offset outside the Shell plant. Smith and Papania also alleged that the power lines were designed and erected too close to the grease tank where the plaintiffs were working.
The defendants filed answers and alleged specific defenses.
In response to the suit LP & L filed an exception of vagueness. Woodward, the general contractor, alleged that the plaintiffs injuries were due solely to the fault or negligence of others and also due to the plaintiffs’ negligence in failing to carefully and prudently perform the duties assigned by their employer. Woodward also third partied Northside and, on the basis of the contract existing between these parties, Woodward sought indemnity and to be held harmless. Northside filed an Answer of denial and third partied Shell, Vivien and Highlines for indemnity. They alleged that these parties determined the design and construction of the electrical project.
The two subcontractors who had contracted with Northside: Vivien and High-lines, also filed answers and defenses to the plaintiffs’ actions.
Vivien alleged that if negligence existed it was the negligence of others. They further alleged that the proximate cause of the accident was the plaintiffs’ failure to see what they should have seen and heed the same. Vivien alleged the plaintiffs’ assumption of risk and in the alternative, comparative negligence. They also contended that, in the alternative, the accident was the result of negligence by Shell, LP & L, Woodward, Northside and Highlines.
Highlines answered and alleged that they were not negligent. In the alternative, they pleaded the comparative negligence of the plaintiffs. Highlines also alleged that plaintiffs’ injuries were the result of risks, dangers and hazards which were plainly observable, open, and obvious at the time of their injuries, thus relieving this defendant of liability.
An intervention was filed by Liberty Mutual Insurance Company for reimbursement of compensation benefits paid to the plaintiffs.
In 1988 Shell settled its suit with the plaintiffs. Ray Smith received $190,000 in settlement and his compensation carrier was paid $10,000. Anthony Papania received the sum of $43,934 and his compensation carrier received $6,066.00.
In April, 1989 the representatives of the named defendants were deposed. Based upon this discovery the remaining defen *715 dants sought summary judgment on the issue of their liability.
The trial court granted the motions for summary judgment filed by the prime contractor and three subcontractors. The court also granted a motion for summary judgment filed by LP & L. From these summary judgments granted in favor of the defendants, the plaintiffs and their worker’s compensation carrier appeal.
The mover is entitled to a summary judgment in its favor if the pleadings, depositions, answers to interrogatories and admissions of fact show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. La.C.C.P. Art. 966. Industrial Sand and Abrasives, Inc. v. Louisville & Nashville Railroad Co., 427 So.2d 1152 (La.1988).
The sole issue presented on appeal is whether there exists a material issue of fact concerning the negligence of each of the various defendants so as to preclude their dismissal on a motion for summary judgment. In their appeal the plaintiffs and intervenor contend that there exists material issues of fact as to each defendant dismissed on summary judgment and hence, the grant of summary judgments in their favor were in error.
In particular, the plaintiffs and inter-venor argue that the utility poles and wires nearest the grease tank were so close to the tank that it rendered the electrical service facility defective and unreasonably dangerous for the plaintiffs. Additionally, plaintiffs and intervenors allege that since the general contractor and subcontractors all had input into the design and installation of the electrical service in question, they were all liable to the plaintiffs for creating a risk of harm to them.
Our examination of the record indicates the trial court did not err in granting the motions for summary judgment filed by the various defendants.
In seeking summary judgment, LP & L argues that it did not own, construct or maintain the electric lines involved in this accident and hence, it owed no duty to the plaintiffs who were injured by them.
It offered the affidavit of Mr. F.M. Brooks, an expert electrical engineer/ who attested that the electrical lines in question were in compliance with the National Electrical Safety Code. They were constructed by Highlines, as a subcontractor to North-side, and these parties were working under the general contractor, Woodward, who had been issued a purchase order by Shell Oil. The lines were installed in accord with plans prepared by Vivien in conjunction with Woodward and the architect, Larry Case. According to Mr. Brooks, the lines were not dangerous and were under the exclusive ownership, custody and control of Shell Oil. LP & L owned and maintained its electrical distribution facility up to the point of its metering equipment.
In opposition thereto, the plaintiffs’ offered the affidavit of Robert T. Nethken who is also an expert in electrical engineering. Mr. Nethken stated that it was his opinion that the electric line in question was a dangerous facility. It was also Mr. Nethken’s opinion that LP & L had the right and duty to turn off power from a facility they deemed dangerous. Mr. Nethken further stated that running the line underground or offsetting it would have eliminated the danger.
In Hughes v. Louisiana Power & Light Company, the court held that no duty exists for an electric utility company to inspect the. premises of its customers for hazards. 94 So.2d 532 (La.App. 1st Cir. 1957). The court in Hughes, supra at 535 stated:
“The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser’s wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is not duty of inspection to see that the purchaser’s wires and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or *716 occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused by their defective condition, to such owner or occupant, * * *. [However,] “knowledge of the defective and dangerous condition of a customer’s appliances will charge even a mere generator and supplier of electricity with liability for consequences, where current is thereafter supplied to such defective and dangerous appliances, in which case it is the energizing of the line with knowledge of the conditions, and not the conditions themselves, which forms the basis of liability”, 29 C.J.S., Electricity, Section 57, pp. 611-613. See also 18 Am.Jur. Verbo “Electricity”, Sections 46-53, 62, 85, 100.
In this case, as the supplier of electricity LP & L had no duty to inspect Shell’s premises for hazards. Additionally, there is no evidence offered to show that LP & L knew or should have known that the facility which was under Shell’s exclusive ownership and control was unreasonably dangerous. The conclusionary statement by Mr. Nethken that the facility was dangerous is insufficient to put the issue in dispute. As such, the trial court correctly granted summary judgment on the issue of liability of LP & L.
In seeking summary judgment, the general contractor, Woodward alleged that the electrical portion of its contract with Shell was subcontracted with Northside and, according to the written contract between Woodward and Northside, the complete electrical job of electrical was to be “per plans and specifications including design and engineering fees.” Northside in turn contracted the electrical design to Vi- • vien and the installation to Highlines, with the work being performed under the direct supervision of Robert Eddy of Shell.
The deposition testimony of Earl Langoff supported this defendant’s position that the electrical portion of the work was subcontracted by Woodward. According to the deposition of Mr. Paul Flowers of Woodward, Shell told the subcontractor “how to run the service, where they wanted it run, how they wanted it run, and ... where they wanted the poles located”. Mr. Flower also testified that numerous meetings were held with Shell where they provided detailed information concerning their requirements.
The deposition of Robert Eddy, an electrical engineer with Shell, indicated that the electrical poles were installed by High-lines in conformity to Shell’s requirements and in accordance with the plans and specifications provided by Vivien. Additionally, according to Mr. Eddy the decision to install overhead lines and not to offset the lines was made by Shell.
In opposition to Woodward’s position that it was shielded from liability because it subcontracted the electrical work, the plaintiffs and intervenor first argue that Woodward’s participation in the design subjects them to liability. In support of this proposition they offer the deposition testimony of Paul Flowers, a representative of Woodward, to the effect that on some projects Woodward is responsible for some or all of the design, as well as the construction work.
They next argue that Woodward had the overall duty to supervise the subcontractors. In support of this position, plaintiffs and intervenor offer further deposition testimony, of Paul Flowers wherein he states that a separate service was suggested by Woodward, because it was less expensive. Flowers stated he did not recall a conversation regarding safety. He did not walk around and get a general idea of where the construction of the utility poles were to occur because this was delegated to North-side and their engineers. He did not speak to Shell about the grease tank. He did not recall any conversations with Shell, their representative, Northside or any of the subcontractors concerning the distance from the grease tank to the utility pole. It was Flowers’ understanding that Northside and their subcontractors measured the lines but he was not sure. For these reasons plaintiffs and intervenor argue that summary judgment is not proper.
*717 Ordinarily one who engages an independent contractor is not liable for the negligence of an independent contractor performing his duties under contract. See Trapani v. Jefferson Parish, 180 So.2d 850 (La.App. 4th Cir.1965).
In this case the plaintiff and intervenor have failed to show that the general contractor, Woodward, participated in the design of the electrical project on this project and hence was directly responsible for any negligence in design. Additionally, they have failed to show that a duty existed for Woodward to supervise the subcontractors in that no countervailing evidence was presented to show that the sub-contractors who performed the work were acting as other than independent contractors as was alleged by Woodward.
For this reason summary judgment was properly granted.in favor of Woodward, the general contractor.
Northside sought summary judgment on the issue of their liability and in so doing, alleged that they had neither designed nor constructed the electric lines which were involved in this accident. They alleged that they hired Vivien to design the lines and Highlines to construct them in accord with the plans and specifications dictated by Shell.
In support of its position, this defendant offers the affidavit of Mr. Ralph Glaub a superintendant with Highlines who stated that Highlines set a price for the job with Northside after meeting with Shell’s representative, Bob Eddy, who specified the location, placement and height of the poles and the type of lines desired. The job was, according to Glaub, completed by his company in keeping with Shell’s specifications. The facts set forth in this affidavit were further corroborated by a similar affidavit executed by Shell’s project engineer, Mr. Bob Eddy.
An additional affidavit of Mr. Eddy was offered wherein he attested that the power lines in question were owned, maintained and operated by Shell. He also stated that the lines were constructed by electrical contractors and the location of the lines were determined by Shell.
A sketch of the plans indicating the specific requirements and location of the electrical service, as well as the site plan, were offered in support of the motion of summary judgment.
In opposing this motion for summary judgment the plaintiffs and intervenor argue that the overhead survey and site plan do not constitute written plans and specifications and thus this defendant is not statutorily immune from liability.
The deposition testimony of Earl Lan-ghoff was offered in support of the opposition. Mr. Langhoff testified that he did not give the specifications to Highlines but the estimator, Don Lagros, did this. According to Langhoff the drawings given to Highlines were not accurate.
Louisiana Revised Statute Title 9 Section 2771 provides for statutory immunity of contractors when work is performed according to plans or specifications:
R.S. 9 Section 2771. Non-liability of contractor, for destruction or deterioration of work
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor. Acts 1958, No. 183, Section 1, as amended Acts 1960, No. 84, Section 1.
In this case although plaintiffs and inter-venor argue that the provisions of immunity afforded by this statute are not applicable because the plans and specifications in this case were not in writing,: the statute makes no such qualification for applicabili *718 ty. Additionally these parties have not cited us to any authority which would support such a position.
The testimony of Mr. Langhoff to the effect that the plans were not accurate is not probative of this issue since he admits it was the estimator, Don Lagros, and not himself who gave the specifications to Highlines.
Since a contractor who carries forth a project according to the plans or specifications has statutory immunity, Northside was properly granted summary judgment on the issue of its liability.
Additionally, Northside subcontracted the work to Vivien and Highlines. Absent proof that Northside knew of a defect in the plans by which the subcontractors carried out the project, Northside is relieved of liability because Vivien and High-lines were independent contractors who were independently responsible for their actions. Hughes v. LP & L, supra.
The plaintiffs and intervenor were unable to show by credible proof that a defect existed and that Northside was aware of it. For these reasons also summary judgment was proper in favor of Northside.
Vivien contends that it was not negligent in designing the plans for the construction of the electric lines on the Shell project because the plans were in keeping with the National Electric Code and reflected the specifications dictated by Shell, the owner.
In support of this position Vivien offered the affidavits of Lucien Vivien, Robert Eddy and James Couturie. They also offered deposition testimony of Robert Eddy and Ralph Giant.
In his deposition Lucien Vivien stated that he was contacted by K & W Electric and his company prepared plans for North-side Electric. The parties to the project indicated that Shell requested overhead electrical lines and the request was also made that the plans utilize 70 foot poles placed 9 to 10 feet in the ground. The field conditions and survey met National Electric Code standards. According to Vivien the contract with their company was not involved in construction, supervision nor inspection. They were merely responsible for preparing the electrical plans utilizing 70 foot utility poles and the offset and location as determined by the parties involved in the construction.
Robert Eddy, the Shell project engineer attested that he told Highlines’ representative, Ralph Glaub, of the routing of the power lines including the requirements that the poles be 70 feet high, the location of the poles, and the desire that the lines be overhead as opposed to underground. According to Mr. Eddy these requirements were conveyed to those entities who were responsible for the design and construction of the project. According to Mr. Eddy the project was completed by Highlines in accord with the plans and specifications provided by Woodward and as communicated by Eddy, as Shells’ representative, to Woodward. Mr. Eddy also stated that no Shell employee was required to nor did they inspect the project constructed by Woodward. In his deposition, Mr. Eddy testified that he and Mr. Glaub walked the project site where the power lines and poles were to be placed and he informed Mr. Glaub of the routing of service. According to Mr. Eddy he had no knowledge of any conflict between the plans sent to Vivien and field conditions. Additionally Mr. Eddy was unaware of the existence of any such conflict. According to Mr. Eddy the specifications were prepared for the project in keeping with the standards set forth in the National Electric Code.
The affidavit of James Couturie stated that he prepared and was personally familiar with the survey for the Shell project. According to Mr. Couturie the pole which was erected closest to the accident location stood at a height of 58.6 feet and the line to the top of the tank was 15.5 feet away from the tank on a diagonal.
Ralph Glaub testified that he spoke with Mr. Eddy concerning the spacing of the utility lines and he was instructed to place them as far on the property line as they could. Mr. Eddy also indicated where the poles should be located and he supervised their installation. Mr. Glaub stated he did *719 not have drawings and he did not speak to anyone from Woodward. He did speak to and did the work for Northside. He never spoke to Vivien and didn’t know whether they had drawings. The poles were set 10 feet down.
In opposition to the Motion for Summary Judgment plaintiffs and intervenor offer the testimony of Lin Gee a licensed electrical engineer with Vivien who created the site plan for this project. Mr. Gee stated that he was unaware of the location of the grease tank and did not ask the Shell representatives about any potential obstruction. Gee also did not recall speaking to Bob Eddy regarding the design of the electrical pole.
Hence, these opponents argue that since Mr. Gee never spoke with Mr. Eddy about the design the mover could not in good faith allege that it followed Shell’s instructions.
The affidavit of Mr. Eddy of Shell indicates that he conveyed to entities who were responsible for design Shell’s requirements that the poles be 70 feet high, they be overhead and their desired location. The fact that Mr. Eddy did not directly convey this information to Mr. Gee is of no moment if the design was in fact prepared according to these Shell specifications. Plaintiffs and intervenor have failed to place this pivotal issue in dispute. Thus, since mover has successfully shown that the design was according to Shell’s plans and specifications, it is immune from liability and summary judgment was properly granted in their favor.
Highlines, the installer of the power poles and electric power lines also moved for summary judgment on the basis that as a subcontractor who performed the work according to plans and specifications provided by the owner, it was immune from liability. La.R.S. 9:2771.
In support of its position Highlines offered the affidavit and deposition testimony of Robert Eddy of Shell and an affidavit of Lucien Vivien.
Mr. Glaub’s affidavit indicates that, as a representative of Highlines, he met with Bob Eddy of Shell at the Shell project site. At the time Mr. Eddy discussed the new electric service and in particular, he specified the location, height, and type of lines desired. Based upon this meeting, a price was given to Northside and a purchase order was issued to Highlines to build a 13KV line to service the new facility. Mr. Glaub then sent a Highlines’ distribution foreman to build the new line at Shell. Mr. Glaub met Mr. Eddy at the job site to oversee the construction of the line. The line was constructed in strict conformity with the Shell specifications. These facts were further corroborated by the affidavit of Bob Eddy, Shell’s project engineer.
Mr. Glaub’s deposition also indicates that he and Mr. Eddy walked the grounds of the job site and Mr. Eddy indicated the location of the poles to him. According to Mr. Glaub, Mr. Eddy was present the first day a pole was set. When the last pole was set there was a stake to indicate the spot where it was to be located.
Mr. Eddy testified in his deposition that Mr. Glaub would talk to him in order to verify the lines’ location. He also testified that the poles were placed, in all probability, at 70 feet elevation. Mr. Eddy stated that he compared the work done by High-lines and found it to be in compliance with Shell’s requirements and the plans furnished by Woodward.
In the affidavit of Lucien Vivien, he stated that his firm had entered a contract with Woodward for the Shell project. He was instructed that Shell desired overhead lines on 70 foot utility poles. The electrical plans were prepared requiring 70 foot poles which were placed 9 to 10 feet in the ground. According to Vivien the field conditions of the utility lines as constructed and the Couturie survey met the National Electric Code standards. According to Mr. Vivien, his company was not included in the Shell construction and had no supervision or construction requirements under the contractual agreement. Additionally, the electrical plans included 70 foot utility poles and the offset and location was determined by those persons included in the construction.
*720 In opposition to the motion for summary-judgment filed by Highlines, the plaintiffs and intervenor offer the deposition testimony of Ralph Glaub, Highlines’ general superintendent. In his deposition Mr. Glaub stated that he discussed with Mr. Eddy of Shell the location of the poles and he was told that they were not to be set outside the fence on the Shell property. They were to be placed close to the property line which Mr. Eddy told him was inside the fence line. Mr. Glaub stated that he did not have the plans. Mr. Glaub also stated that Mr. Eddy was present at the time of the installation of the poles and he supervised the exact placing of the poles. According to Mr. Glaub, Mr. Eddy did not tell him how high out of the ground he wanted the poles, but they were set 10 feet deep which is the codal requirements. The pair did not discuss safety, for according to Mr. Glaub, there was no need to discuss this. He also did not discuss safety with North-side. Mr. Glaub further stated that he had not seen the electrical drawings prepared by Vivien.
Thus, the plaintiffs and intervenor argue that Highlines could not seek the protection afforded to a subcontractor who follows plans and specifications because Highlines never ascertained the actual height of the poles, the distance from pole to pole, never saw the plans or Vivien drawing and never discussed safety. La.R.S. 9:2771.
It is clear from the testimony presented by Highlines and at least in part substantiated by the testimony presented by the plaintiffs and intervenor that the poles were constructed according to the plans and specifications indicated by Shell’s representative and to Shell’s dictates. For these reasons the court did not err in granting summary judgment to Highlines on the issue of liability.
Accordingly the summary judgments granted by the trial court are affirmed at plaintiffs’ and intervenor’s costs.
AFFIRMED.